I think we're ready, Mr. Michael. Good morning, Your Honors. Chuck Michel appearing for appellants. May it please the Court, I'd like to reserve five minutes for rebuttal. Keep dragging your own time. I'll try that, if they mind you. I'd like to suggest preliminarily that the Court, in approaching its decision in this case, needs to consider the nature of the right that's really at issue here. It's easy to sort of focus on the right to keep and bear arms, the Second Amendment, and I think that's what this district court did, but that's really not the right scope of the inquiry. The Heller case tells us that the Second Amendment elevates, above all other interests, the right of law-abiding, responsible citizens to use arms in defense of hearth and home. What we're really talking about is the Second Amendment, the constitutional right to keep and bear arms, effectuating the natural right to self-defense. Heller tells us that the self-defense is the central component of the Second Amendment, and so what we're really talking about, when it gets right down to the bottom line here, is survival, fighting for your own survival and having a constitutional right to possess the firearms, the tools most effective for self-defense to use when you're trying to save your life. But I ask you about that, and counsel, you know, after reviewing the declarations that were submitted to the district court, it appears to me that nearly all the harms you identify can be resolved under the terms of the San Francisco Ordinance by buying a better gun safe or trigger lock. So why shouldn't we find that the ordinance is unconstitutional? So why should we find that it's unconstitutional simply because it creates a minor inconvenience as opposed to the danger to children or robbers coming to a – into a house at night and having a loaded gun by the bed that can be either stolen or picked up by a child, whether or not you have a child living in the house? Well, preliminarily, I'd say as a former prosecutor, I certainly sympathize with the victims of crime and firearms accidents. But what we're talking about here is a delay. There's – in the briefing, there is evidence from the city where a city attorney's investigator took one of these lock boxes and said it took three to five seconds to be able to open that box. Our expert, one of the most renowned self-defense experts in the world, said, wait a minute, it takes a lot longer than that. It might take three to five seconds if you're in perfect conditions, well lit, you have your reading glasses on, you're not reacting to a breaking window in the middle of the night, the adrenaline level isn't as high as it ought to – as it will be, and even if it is just three to five seconds, three to five seconds is the difference – can be the difference between life and death. But when I look at the ordinance as a whole, it doesn't prevent the person from owning a handgun. It doesn't prevent the person from having the handgun in the house loaded. The only thing it prevents is when the person goes to sleep, it has to be locked up. So that's just a small slice of the self-defense requirement. It's not the whole – the whole self-defense use of a handgun being precluded. Why should we take that small slice of it so seriously? Well, first of all, Your Honor, respectfully, the ordinance does not just apply when you're asleep. The ordinance requires that the firearm be locked at all times, during the middle of the day, when you're home alone. Unless you have it on your person, right? Unless you carry it. So you can hold it and carry it and have it around. And from your briefs, it sounded like the real concern was at night because you didn't want to go to sleep with it strapped on you, which seems reasonable. Well, that's sort of a central problem, but we don't think we should be required to carry it around during the day either. That has some – that presents – if we're going under sort of a substantial burden analysis, that presents substantial obstacles of its own. We keep in mind, bad guys don't ring the doorbell. If you're – what is the city's existence? Obviously, this is the thrust of the brief as well, but it's – you know, there's nothing in the ordinance that prevents you from having a loaded double-barrel shotgun right by your bed. You can instantly pick it up and blow them away, right? Except that the Heller court tells us that the handgun is the quintessential self-defense firearm, and in the Heller case, there was a locked storage requirement on long guns and a handgun possession ban, and both of those ordinances were struck down independently. Help me with this. As I read these cases particularly more, and as the – and the Chicago cases, and the original Heller case, it seemed there's a dichotomy. On the one hand, you've got ordinances that absolutely ban certain actions that are protected by the Second Amendment. On the other hand, like in Heller 2, where the DC Circuit adopted an intermediate level of scrutiny, the ordinance had been softened. There was a – there was a – not a complete ban. Isn't that what we're really looking at here when we determine what the appropriate standard of review is, is whether this is a complete ban or a partial ban? Isn't – isn't that as opposed to instantaneous being able to pull up a gun in a matter of seconds? I – to the extent that a complete ban means it's complete infringement, and a partial ban means it's partial infringement, I guess the answer to that question is yes. But from a constitutional perspective, we don't really treat First Amendment rights that way. Well, sure we do. Sure we do. If you have a – in First Amendment issues, you have, you know, regulations about time and place and manner, as opposed to content-based ordinances. There's all kinds of differences. I've got a list of all kinds of fundamental constitutional rights where you have intermediate scrutiny. And it all seems to be based upon the level of government control. What I'm struggling with about your position here is it seems like you're trying to treat this ordinance as if it were a complete ban on an ability of a person to exercise his or her Second Amendment rights, and I'm struggling with that. I don't – I'm not – I'm not seeing where that exists. Well, I just – the test is not impossibility. That's – it's not unconstitutional only if it's impossible. It's also unconstitutional depending on the level of infringement. From our perspective, the way the Second Amendment effectuates the right to self-defense in the home, where it's indisputably – the other cases got tied up on core and non-core proximity, we're back in the home here, that Second Amendment effectuating the self-defense in the home is the equivalent of the First Amendment effectuating political speech in a public forum. But didn't Hiller suggest that a license requirement is something that would be allowed? So even though a license requirement would affect your use of a handgun in a home, Hiller at least suggested that's okay. So it couldn't be that there's no – there can't be any possible burden on a – on a handgun in the home, right? And this is where scope comes in. If you consider whether it's in the scope of the right, and we submit that if it delays your ability to exercise your right to self-defense, then it's within the scope of the right. Licensing does not stop you from being able to get to your handgun in a second when you hear the glass breaking. So that's a different question. In this case, what the city is saying is that you can exercise your right to self-defense, but you have to do it with one hand tied behind your back. But couldn't I delay somebody's right to speak? I say you have to think before you speak, so you have to count to 10. I mean, would that – would that be strict scrutiny, or would we use – I wish we could pass a law like that, but I don't think we could get away with that. You have to think before you speak. I mean, I guess the more appropriate question is, could we impose a one-cent tax, some kind of a de minimis tax, on handing out political leaflets in a public forum? What's a penny? We don't look at it from the perspective of the burden on the right, the severity of the burden or whether it's a substantial burden. And I can address all the issues with that test, which is presuming that that's the test the Court's going to take. Well, let me take another tact here. Assuming there is a right to self-defense, and we all agree to that, this particular statute or regulation does not impede that. It's the timing here. Isn't this part of our democratic process that we acknowledge a right, but when safety is involved or protection of the public is involved or protection of the individual who owns the gun is involved, if the people say, we think this is going to make it safer, not impinging on the right to self-defense here. You can carry a gun around in your pocket if you want to when you're awake, but if the people say, this is too dangerous, even though you don't have children in the house, children may come in, if you look to the armed robberies, they're committed mostly by teenagers who come in and steal guns and so forth. And the – through the democratic process, we say this is too dangerous. This is a safety limitation. What is your response to that? That begs, I guess, the question of what the standard of review would be if it's substantial burden or a means-sense test. Of course, the government can regulate fundamental rights to a point. My response, preliminarily, I respectfully disagree that this does not slow you down or infringe on your right to self-defense, because that three to five seconds, even if that's all it was, I submit it's a lot longer, can make the difference between life and death. But the city could do – the question really becomes, are there more viable or less intrusive alternatives that the city could adopt to advance whatever interests it reports to have? And some other cities have adopted storage ordinances, which may not be a violative of the Second Amendment, because they allow – you don't have to either have it locked or carry it in the shower or wherever you have to carry it. You can just have control over it. And even in this ordinance, they give an exception to the police that they can either lock it or control it. Now, if you have to just control it, then the question becomes, can you get to that gun as fast as you need to if it's now controlled by you sitting on the nightstand next to your bed when you hear the glass break, as opposed to – and Justice Scalia and Roberts, when the oral argument in Heller was going on, they sort of ridiculed this notion that these safes are going to – these types of gun safes, which, by the way, most manufacturers recommend against having a gun loaded in there, that it's – you're going to be able to get to this quickly. And we quoted their exchange in our case. But even so, that suggests if there is going to be some kind of an infringement, what's the next step is – what's the standard of review to determine? How long a delay does your client, your clients, feel is constitutionally acceptable? A minute? Half a second? No time? A delay to get to your firearm to be able to use it for self-defense? Yeah. Correct. None. So you're saying there can be no delay at all. That's your position? Well, I guess it could depend. You know, if you had children in the home or – essentially, the question isn't how long can the – it's what extent of infringement will we tolerate? Who is we? Well, society, the plaintiffs, and the court. Yeah. That's kind of what we're – And this is a – this is a judicially discovered amendment. We're trying to fill it in, right? Yes. We're all – we're all struggling with it. We're all grasping at it. And so I'm asking you, and I – you've got to represent the National Rifle Association. Is it your position that there can be no delay, not one nanosecond, in what you refer to as an infringement on a Second Amendment right? Is that correct? Let me put it differently. The question isn't so much the delay. I'd actually like you to respond to that question. Not necessarily. Okay. Maybe there can be a delay. Okay. But you cannot diminish your – your ability to defend yourself via that delay. So if there's a way, maybe there'll be technology – Could I just ask, are you saying that it would be subject to strict scrutiny or are you saying this is just a flat ban? I mean, even in the First Amendment, something that is content-based is subject to strict scrutiny. We suggest that this – you can either do what the Heller Court did, which is say that this is an infringement, not the same degree, didn't make it impossible, just makes it impractical. And so categorically, as Heller did, it doesn't pass constitutional muster. Or my next – my next position would be that, yes, it needs to be strict scrutiny. But Heller outlawed any operable weapon. This is not the case here. That's correct. This is not as extreme as Heller. It's not impossible to defend yourself. It's just more difficult to defend yourself. And in making it more difficult to defend yourself, you decrease the odds of surviving. That's the balance that – that's the issue that people who choose to own a handgun to defend themselves in their home don't want the odds to go down. They want to maximize their odds of surviving, and they don't think the government should be able to limit those odds. Let's say we disagreed that this was a flat ban under a historical approach or strict scrutiny, but it was actually intermediate scrutiny, because although it's a burden on the self-defense right, it's not a severe burden. Would this ordinance survive an intermediate scrutiny? Is that a narrowly tailored requirement? No, because it's – it's not – I don't think it's narrowly tailored. But most of the bigger problem is it's not substantial. It burdens substantially more conduct than necessary. Is that the standard we're looking at? I don't want to – I apologize to my colleague. I don't want to interrupt, but I want you to weave into what you're going to say to her whether we ought to be following the Marzarella Third Circuit approach or the one you keep referring to as the Second Circuit de Castro approach as we decide what's the appropriate standard of review. Can you keep that in mind as you answer her question? Well, I – that standard of review answer, that's a long answer. The de Castro approach seems to be a spinoff of the Nordyke substantial burden approach, which fleshed out some of the issues that were left open. Let me just say, having sat on the Nordyke court, the Nordyke court said nothing about the standard of review. There was a lot of discussion. There was a concurrence, which has no weight. It's just bloviation. And there was another concurrence that said we should address the standard of review, but oh, well. A lot of people would like to. At least they'd taken you up on that because all of our jobs need to be done. We may be dealing with it here, but Nordyke did not – ultimately did not get there. So Nordyke doesn't really help anybody. We have the three. We have the Second Circuit approach, a substantial burden approach. There's the Marzarella approach, which was a levels of scrutiny. And then I think your brief cited Judge Kavanaugh's dissent saying it's just look at whether it's within the historical scope of the Second Amendment or not. Verrilli,, Yes. And there are a number of judges that cite to those different approaches and distinguish kind of go – they're a little truer to Heller. But the real question, I guess, I think there's more than two approaches. There's sort of the categorical Heller approach. There's the proximity to the core approach. There's a twist on that, which is means end. Then there's a twist on that means end where they start with the severity of the burden analysis. And that's what I'm sure the city would like to have happen, because it's judicial empowering, which is something that Heller warned us against happening. But that's really not as founded in some standard constitutional principles starting with the severity of the burden. And then there's a substantial burden, which seems to be a combination of undue burden and some time, place and manner restrictions. Kennedy, Can I get you to decouple that stuff for a minute? You've got the Third Circuit approach, the Second Circuit approach, and Judge Kavanaugh's approach. Do you, on behalf of your client, propose that we use any of those three in making a determination about the appropriate standard of review to apply to this ordinance? The first choice is Kavanaugh's approach, which is the approach that the Supreme Court adopted in Heller. It didn't need to go any further than examining the scope, determining whether there were some kind of historical, historically accepted category of regulation that the framers would tolerate when they drafted the Second Amendment. And if there wasn't that type of category, they tolerated it. So basically, your preference would be that we put on our historian's hat and discover a standard of review? No. As Judge Posner pointed out in the Moore and the Shepard v. Madigan cases, the Supreme Court's already done that. He didn't need to do that. They didn't. It's outside the standard of review. They specifically said they didn't. No, no, no. You mentioned the historian's. Yeah. That's what I'm talking about. The Heller and both sides dealt with history. Yes. But you can legal history. So what I'm asking is by Judge Kavanaugh's approach, are you suggesting that in this case, that this panel should take the historical approach and analyze the ordinance of the city and county of San Francisco and determine whether this would have passed muster historically? Is that your preferred approach? That's how we laid it out in the briefs. And when you look, then you get into the storage ordinance in Boston and the county storage ordinance. Okay. And if we didn't do that, what's your second choice? Strict scrutiny. Strict scrutiny. Oh, I understand that's where you want to get to, but the methodology. You don't need to get to strict scrutiny if you just end it with a categorical approach. Heller, as you pointed out, never got to strict scrutiny because it just said it's unconstitutional categorically. But I'm asking for the methodology for helping us determine the appropriate standard of scrutiny. I thought you were referring to the Kavanaugh approach as being one approach. But then you've got the Second Circuit, Mozzarella approach, then you've got DeCastro. Do you believe that either of those is preferable from your perspective in assisting us to arrive at a standard of review? I think the Second Circuit's approach is completely wrong. You think DeCastro's wrong, so you would go with the Third Circuit? Well, if you're not going to go with Heller, then go with the proximity to the core. Well, I don't use that language. That's your language. But I mean, the proximity to the core, it could be fracking legislation. We're really talking about the standard of review that we have to decide on. There's a framework for our making that determination. Neither the Second Circuit nor the Third Circuit talks about proximity to the core when they analyze Second Circuit, I mean, Second Amendment litigation. Do you believe that either of these approaches is better if we don't follow the Kavanaugh approach? To the extent that they go, they evaluate severity first, it's worse. So I may be missing the- You know what I'm talking about with these two cases, right? I sort of see it as a progression. There's- Forgive me, because I don't want to, I didn't mean to interrupt you, but are you familiar with the Mozzarella case and the DeCastro case? Yes. Do you know what the framework that they established? That's more of the severity of the burden test. Which of those two do you prefer if we didn't do the historical approach in order to determine the appropriate standard of review? Well, some kind of an approach, a means and approach that did not begin with severity of burden. And that's pretty much what all the other circuits have done. The DeCastro goes to substantial burden. Mozzarella goes to severity of the burden initially. And the other cases start with proximity to the core before they even consider burdens. But at the very least, we shouldn't be considering burdens multiple times, first in the context of determining a means and standard. And then again, when you're doing either strict or intermediate scrutiny and determining narrow tailoring. Okay, let's hear from the city and county and then we'll give you a little bit of time to respond. We've taken you a little bit over. Good morning, your honors. May it please the court. I'm Christine Van Aken. I'm here for San Francisco and its official defendants. Excuse me. Would you speak up so the people in the back can hear you? Thank you, your honor. Is that better? Better. This is a preliminary injunction appeal. I will start by discussing the likelihood of success on the merits with respect to the storage ordinance, then the ammunition ordinance, and finally some points related to the preliminary injunction posture. San Francisco's ordinance, as the Court understands, affects only handguns, not long guns. It allows people to carry their handguns in the home. It allows them to carry those handguns loaded. It imposes only the modest requirement that when those handguns are not carried, either in hand or in a holster, that they be locked up to prevent unauthorized access by people who don't have permission to access those guns, including children, robbers, people who are prohibited at law from possessing guns. As a practical matter, though, that means they would have to be locked up at night. I think that's the point opposing counsel makes, and that seems, just as a practical matter, that seems right. Do you disagree with that? I don't disagree with that. I think in theory the ordinance doesn't rule out carrying a gun in a holster at night while you're sleeping. I don't know if that's – that may not be practical to do. So – but generally, other than that, you're free to carry your gun at all times. So there is a burden on the self-defense right, which Heller says self-defense in the home with a handgun is the core of the Second Amendment. So there is some sort of burden on that right that's posed by the ordinance. And so how do we evaluate that burden under whatever the correct standard of review is or level of scrutiny is? Sure. I think you can start with Heller itself, because Heller itself speaks to storage ordinances. And what Heller says – I mean, after all, it was evaluating the District of Columbia's storage ordinance that it found so draconian that it was actually tantamount to a ban. But Heller says that colonial-era gunpowder storage laws don't remotely burden the right of self-defense so much as an absolute ban on handguns. In other words, Heller itself says what's important about the District of Columbia's ordinance is the greater burden. So even in the home – But this isn't a ban on gunpowder, right? This is a ban on a portion of the core right that Heller recognized, which was handguns, self-defense, home. So it's a portion of that right is being burdened by the ordinance. It's not a ban. It is at most a burden in some set of circumstances, a hypothetical set of circumstances. We have no empirical evidence about how common those circumstances are. So I'll make two points about that. First, Heller does acknowledge that storage ordinances can burden the ability to get guns. That's why they're saying it doesn't remotely burden the right as much. That's the language of comparing burdens. Heller also says nothing in our analysis should be taken to cast doubt on storage laws to prevent accidents. But San Francisco does agree, I gather, that this ordinance does burden the Second Amendment. It's a question of degree, but it does acknowledge there is a burden, right? I think there is an incidental burden in some circumstances. That's how I think I would put it. It is not a direct burden. It is not – it's plainly not an ordinance that is intending to discourage the exercise of the right itself. It does not speak so broadly. Let's assume that we don't agree with you, that it is indeed intended to discourage the right. Ultimately, it gets down to the question of, either under the DiCastro approach or the Mazzarella approach, if there is a burden, it gets down to the question of how much does it burden it and what works. And then you get to what's the standard of review. Well, let me add to that. Heller didn't reach standard of review. Correct, Your Honor. Do we need to? I think, Your Honor, that if the Court finds there is at least some burden on the right, then probably it needs to determine how much. I think that clearly the Court could follow the DiCastro approach and say there's no substantial burden here. Even if it's more difficult, it's not a great deal more difficult, and we leave for another day the question of what level of scrutiny to apply if the substantial burden threshold were met. That's what DiCastro, in fact, did. I didn't mean to interrupt Smith's question. Sure. If we have a standard of review, what should it be? Yeah. I mean, I think that the substantial burdens approach is an appropriate one. I think that this is such a modest burden that the Court need not go further. Let me ask you. The substantial burden, that's one that probably goes more on the DiCastro approach, but that's more in terms of how you decide it. But historically, since the Supreme Court talked about the First Amendment being pretty close in terms of the analysis, there you've got strict scrutiny, you've got intermediate or heightened scrutiny, and you've got rational basis, which is pretty much out the door where you have a constitutional issue of this magnitude. As between heightened scrutiny and strict scrutiny, I gather the San Francisco would prefer intermediate scrutiny, right? Absolutely. But I think that's also the correct approach here, if the Court applies any scrutiny at all. I mean, that is the consensus of the overwhelming majority of circuit judges to have considered this issue. It's an approach that at least some judges on this circuit would have embraced in Nordyke, although there did not emerge an en banc disposition to that effect. But I also think that, you know, I think the Court has to do something with Heller's statement that storage ordinances in the vast run of cases are not going to be made unconstitutional by Heller. This Court in United States v. Vongshay, an opinion authored for the Court by Judge Smith, said that, you know, Heller's limitations on the scope of its holding are not dicta. They're part of the holding itself. So I think when Heller says, don't take what we are saying to invalidate all storage ordinances, I think that is not dicta. Any storage ordinance that requires locked storage at some times is going to burden the ability to access that firearm. But what concerns me, I mean, the examples given in Heller of storage ordinances were pretty far away from this one. And what concerns me is the language in Heller, very strong language, about handgun self-defense in home. And here we have an ordinance, however it might be minor, if it was gunpowder or ammo or something else being locked up outside the home, which is at least directly affecting, regardless of the degree of burden, that core right that Heller identified. And so it seems to me we do have to address how much of a burden is it. And so how should we analyze that? What sorts of tools should we use, since I think you agreed as a practical matter, it would at least make very � make more difficult having the ability to use a handgun for self-defense in the home while you were asleep or while you were in bed. So, you know, my colleague just said that the city's ordinance, you know, goes further than other cities, and you should maybe consider a better ordinance that allows a handgun to be under control. I'd submit that the city's ordinance, San Francisco's ordinance, doesn't go any further than those, because it's hard to see how you're in control of a handgun while you're    in control of a handgun while you're unconscious. But I think that the Massachusetts � the Massachusetts Supreme Judicial Court has considered those ordinances. So I think that provides the Court with some tools. And it says, you know, if you look at these framing-era laws that the Heller Court was considering, in practice, they would have resulted in a great deal more delay than we're talking about with modern gun safes. One law prohibited storage of any loaded gun, so in a dwelling. That was Boston. And so you would have had to take at least 20,000 pounds of gunpowder and put it in  And that would have resulted in a great deal more delay than we're talking about with modern gun safes. So, you know, if you look at these framing-era laws that the Heller Court was considering, in practice, they would have resulted in a great deal more delay than we're talking about with modern gun safes. One law prohibited storage of any loaded gun, so in a dwelling. That was Boston. And so you would have had to take at least 20 seconds to load your musket. Another said, you know, others said you have to store your excess gunpowder either on the top floor of the house or in these special containers. So in practice, you would get one shot with whatever weapon you had loaded on hand before you had to go retrieve your gunpowder from wherever it was stored and then undergo that 20-second reloading process. And in contrast, modern storage tools are nearly instantaneous. We've got a declaration to that effect. I know sometimes clerks like to – a picture can be worth a lot more than words. There's a YouTube video that we've cited in our brief that actually shows the kind of safe that the – that our declaration talks about. And you just put your thumb on the keypad and you turn it. You know, Mr. Michel tells us that sometimes these safes don't work. But that's merely a set of hypotheticals. And really, this idea that hypothetically speaking, in some circumstances, this law could disarm me, that that is enough for strict scrutiny, that standard would jeopardize a lot of familiar gun restrictions. One of them is California's 10-day waiting period. To purchase any firearm here in California, you have to undergo some background checks that take some time. Now, other States have three days, five days. Some of them also have 10 days. But in any case, that is complete disarmament for a person who doesn't already own a gun. That person is completely disarmed for a period of days. Another example is the kinds of training requirements that the Heller 2 case talks about that the District of Columbia imposed. You can't require someone to go to training before they can purchase a gun for their bedside table if you can't delay them in the use of their gun at all. Another example is the NRA v. ATF case that the Fifth Circuit recently decided. People aged 18 to 21 can't purchase firearms from – can't purchase handguns from retail dealers, which impacts their ability to have handguns at their bedside table, delays them for up to three years if they can't find another means to get those guns. Kennedy. Can I ask, just an adjunct to this, I would just check in the ordinance here just to be sure that my recollection was correct. Yes, Your Honor. Putting these firearms in a lock container isn't the only thing that can be done, right? Can't they be dislabeled with a trigger lock? Yes, Your Honor. So you can actually put the gun by the side of the bed, if you want to do that, and a little gun whatever, and have a trigger lock on it. Absolutely, Your Honor. You can also – gun safes are also – But what is the – is there evidence in the record about the speed of removing the trigger lock? You know, we didn't test the trigger lock, so we don't have evidence about that. I think the biometric safe is probably the fastest option, but those are very small. You can have one by your bedside table. You can have one in every room in your house if you want. You can have one by the shower. So it doesn't – you know, there are many ways you can get to the gun very quickly. Before you go away from that, I want to be sure, because I don't pretend to be a big hunter, but I've done some hunting, and I think I'm familiar with trigger locks. They're not that hard to disarm, if you will. It's probably the bad word, but to unlock them. Right, right. Is there any evidence in the record that indicates how long it takes someone to unlock a trigger lock? No, not that I'm aware of, Your Honor. We didn't – we didn't test trigger locks as part of our – That is part of the ordinance, right? That's one way to go. It is part of the ordinance. Absolutely, you can – I mean, I was just looking to see what they looked like, and they were like – there were some combination ones that were – but most of them had lock and keys. What exactly do they look like? Do they need a key to open or – So they vary. Some of them have combinations, sort of familiar from high school lockers. Some of them have this biometric, the keypad, and then you just turn the knob. Some of them have, like, a keypad combination. You can either program letters or numbers, and you can choose – do you want three digits, do you want four digits, do you want five digits? And you can choose all of that at the front end. Most of them have some sort of key as, like, a fail-safe. If you have an electric – if you have a battery, for instance, that operates the keypad – But you could have one, say, that has four, and you could have three of them in place, and all you needed to do is to move it up one click, right? Yes, absolutely. Absolutely. So I think Appellant makes the argument with the biometric safe that it's – they're very expensive and that the cost is a burden on the right. What's your response to that? Well, they don't put in any evidence of the expense, and it's their burden here on preliminary injunction. More importantly, California requires everyone who purchases a handgun to purchase a locking device, and they don't challenge that here. So that requirement stands regardless. I want to move on to the NRA's claims – their admissions about the lawfulness of other storage laws, because I think that is very important. You know, we heard – we heard some contradictory statements a moment ago. The first was that the Second Amendment tolerates no delay at all, not even a nanosecond, because that is the very core of the right. And I think that that proposition is very extreme, and no court to have looked at even home-based regulations or regulations that impact the home would adopt that. But then we also hear, well, if there are children, then maybe. And that's an admission that the NRA really makes in its opening brief. They say, well, these child access prevention laws that some states have are okay, but San Francisco just goes too far. Well, as to the people who are actually affected, that – the burden is exactly the same. This is an admission that at least some people can be required to lock their guns if there is a good enough reason. So – so I guess the question is – another part is this facial challenge issue. Yes. Whether we're looking at whether the substantial – every incident is – is unconstitutional, or are we just looking like – more like the First Amendment, whether its substantial sweep is not constitutional? And as I understand the argument, because there's a less restrictive alternative, because it could be narrower and just be aimed at houses with children, that casts doubt on the constitutionality of the ordinance as a – as a whole. I mean, yes, I think that's the argument. They'd like strict scrutiny if you're going to not categorically invalidate this. But I think in light of the degree of burdens, that's inappropriate. But I think even on this record, what we have is we have expert declaration from Dr. Webster that firearm theft is a very serious problem, and that there are serious problems with unauthorized access as to other people besides children, young adults, extremely impressionable, people with depression or mental illness, robbery, as I mentioned a moment ago. So the city has made an empirical judgment that these also are serious risks of harm, and that the ordinance can protect from those risks. So in the First Amendment context, I think the city of Renton suggests that we would defer to legislative findings about whether it's narrowly tailored or whether it's a reasonable remedy. Is there anything outside the adult porn shop cases that would say that San Francisco's owed deference in this context? Yeah. I think the commercial speech cases do this, too, in the First Amendment. I think Florida versus Florida bar none versus went for it. I'm probably getting the word order mixed up. But that's a commercial speech case with Florida bar none in the title. And what it says is that, you know, sometimes you can even anecdote, even supposition can support, as long as it's reasonable, as long as the legislative judgments are reasonable. I think San Francisco goes beyond that here. Police Code 4511 sets out San Francisco's specific findings. And there's discussion of rates of, you know, gun, how many people are killed in the home who are intruders versus friends and family, sightings, studies that are referring to studies that support storage ordinances. So I think we've more than carried that burden here. I noticed that your opponents referred to the fact that the ordinance is overbroad because there aren't children in every home and so on. And the city has findings about suicide and about domestic relation shootings and so on. That, I gather, is your response to their argument of it being an overbroad ordinance? The fact that other people can be unauthorized users, that diminishing availability in these kinds of situations can help diffuse the situation. So, yes. I think also, you know, I would compare this to a regulation, you know, they admit that these safe storage laws that say retrospective liability when a terrible thing happens is constitutional. When a child gets a gun, you can be held liable as a felon. Well, you know, that's not normally how safety ordinances work. We don't say people have to wear seat belts if they think they're going to be, you know, they're likely to be in an accident. If it's a modest burden, sort of a modest prophylactic measure, generally the accepted approach is just to apply it to everyone and because it's really hard to predict in advance. I'd be interested in the city and county's take on the Seventh Circuit cases, Moore and Ezell. There you have what at least to me seemed to be affected bans on particular activities, open carry and firing ranges. Yes. In both instances, they adopted strict scrutiny. Would you address what your take is on those cases and why, if at all, the Seventh Circuit was mistaken in adopting strict scrutiny? I think in the Moore case, Judge Posner was talking about the most extreme open carry law in the country. No exceptions, no permitting exceptions. He viewed that as similar to Moore. So it's the totality of the ban, you think? The totality of the ban. I think in Ezell, the particular circumstance that the city of Chicago, in order to have a handgun, you had to do live fire training. Didn't that just make it more difficult because you could have gone outside of the jurisdiction and gotten the training, correct? Yeah, I don't agree that Ezell was rightly decided with respect to that court, Your Honor. But yes, I think the fact that Chicago was, I mean, the concurring opinion makes this pretty clear that it's sort of the hypocrisy in requiring this and also prohibiting it at the same time that was particularly, that made it. But for constitutional reasons, we don't usually care about hypocrisy. So for constitutional purposes, the ban, there was not a ban on the handgun for safety. There was only a ban on this training requirement within the city jurisdictions. And so there was a burden, but it was, as in this case, it wasn't a complete burden by any means, correct? I mean, it wasn't that it made the training impossible. Right. I think Ezell says not quite strict scrutiny, and that is a very high burden to meet. That's not the majority approach in the circuits, and I think that's hard to square with Heller's statement that, you know, storage requirements don't remotely burden the right as much as a ban. We don't undercut a constitutional right because you can get it in another jurisdiction, do we? Typically, no, Your Honor. I would think that if the city said you can't have any handguns in the city of San Francisco, but it's fine in Oakland, that's going to go down in a second, wouldn't it? Yes, Your Honor. But there's no constitutional right to training within a jurisdiction. Is that right or is there a constitutional right? Well, actually, Ezell actually said that this is sort of part of the right, that the ability to train for proficiency is also protected. So getting to the ammo, then, by the same reasoning, the right to buy ammo within the jurisdiction is sort of equivalent there, right? Are you saying there's a constitutional right to buy ammo within the city jurisdiction? Well, Your Honor, there is an ability to buy ammunition within the city if you do it online. So it's only one – it's not that you have to leave the jurisdiction. Assuming that is a right, you don't have to leave the jurisdiction to exercise the right. I think the important thing about the ammunition ordinance, though, is that it only prohibits the retail sale of a narrow class of ammunition, and there's not an allegation here that conventional full-metal jacketed ammunition renders you unable to exercise your right to self-defense. I think that's what's important about the ammunition ordinance. I see my time has expired, if there are no more questions. Let's ask about the ammunition. There's only one store in San Francisco that sells these kinds of bullets. Yes, any ammunition. And if it decided not to carry them at all, they can order online. Yes. Yes. We don't know. We have nothing in the record. We have nothing in the record about whether they would decide to carry that ammunition were this ordinance enjoined. All right. Thank you. Thank you. Thank you very much. We'll hear a rebuttal, please. Let's give this gentleman two minutes. Your Honor, let me just begin by making – giving a direct answer to your question, which I'm not sure I completely understood.    I understand, of course, that you liked the mars-a-rella means-and approaches to it. As between the Dukaster approach in the Second Circuit and the mars-a-rella means-and approach in the Third Circuit, means-and approach is preferable. Okay. So you prefer the mars-a-r-rella approach, okay. Thank you. First I'd point out, there's nothing in Heller or McDonald that suggests that only bans would be unconstitutional. That happened to be the case in those cases, but there's nothing in the language of those cases that suggests that's it. In this case, the right to keep and bear arms is always burdened, because the right to keep and bear arms is the right to be ready in case of confrontation, Heller tells us this, for immediate self-defense. How do you respond to the argument about the 10-day waiting period, would you say, and those sorts of training requirements? Is that – would you say that that's unconstitutional as well? I don't know. I mean, that's not before us, but that's a prerequisite to getting a firearm into your house initially, and once it's there, you have immediate access to it. So it's a bit of a different thing. So opposing counsel says for those 10 days, you're completely unarmed. Well, there may be problems with the waiting period. That's why most States have national instant check, and they can get that. But that involves purchasing the firearm, not using it in self-defense. That involves acquiring it to begin with. So I think that's a bit different. It might come under the commercial regulation presumption. I just want to see your bottom line here. Are you saying – does the Second Amendment create an individual right to store guns in any convenient manner the individual chooses without regard to public safety? No, that's not our position. Our position is they can't require you to store it in a condition that delays your access, and by delaying your access, reduces your chance of surviving if you ever need to use the firearm. There are multiple other ways that you could store it for safety, but perhaps by doing what the New York and Massachusetts cases did, having a control as opposed to a lock requirement, or exception to the lock requirement. How would you respond – following up on this – how would you respond to my question to counsel for San Francisco? You can have a trigger lock. Yes. So say it's a four-digit trigger lock, and say your combination was one, two, three, four, and you have one, two, three, and the other one, you've got five. All you need to do is pull it down to four. The problem – That's almost instantaneous. What's wrong with that? I'm glad you asked, Your Honor. First of all, there are lots of different kinds of trigger locks. I agree. Generally, they take longer than – Sure. Depending on the gun – But that's the choice of the owner. But you can't store a loaded gun with a trigger lock. You cannot – I'm not aware of any manufacturer that says you can put this gun on a loaded gun, even if it's loaded. That's dangerous, and that's a big problem. Well, that's a value judgment, but I'm talking about what this ordinance says. The ordinance – The ordinance – If I'm understanding it correctly – That's one alternative. You can have a loaded firearm just filled to the brim, and you can have a trigger lock that would have three of the four in my hypothetical, and you can have it by your bed, and you're in compliance with the ordinance. You hear the broken glass, you click one thing, it takes a nanosecond, and you're ready to go. Isn't that right? No. Because then you have to find the ammunition – well, first of all, you've got to find the gun first. Are you saying that you cannot – could I just – just to clarify, because I'm not familiar with handgun use – I thought I heard you say that you cannot put a trigger lock on a loaded gun. Is that correct, or is it just not recommended? Oh, you can physically do it with some trigger locks, and I don't want to get – and there's – I don't have expert testimony on exactly what different models of trigger locks require what. But generally speaking, what you're doing is putting some kind of a post or something around the trigger, and if it's a loaded – it's not like those trigger locks necessarily stop the trigger from moving at all. So there are – the gun can go off with a trigger lock on it, and there's YouTube video demonstrating that time and time again. I think we're out of time, unless my colleagues have questions. I want to thank you both. On behalf of the panel, you've done an excellent job representing your clients' interests. Thank you. These are very challenging, very difficult issues, and you can rest assured that we will and have been wrestling with this case for some time. We take it very seriously. We understand and respect your positions, and we'll try to discharge our constitutional duties. So thank you. The case just argued is submitted.
judges: Nelson, Smith, Ikuta